# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )     No. 11-CR-20108 A/P |
| | ) |
| CHRISTOPHER YANCY, | ) |
| | ) |
|     Defendant. | ) |

## AMENDED REPORT AND RECOMMENDATION

On April 26, 2011, a federal grand jury returned a three-count indictment charging defendant Christopher Yancy with "carjacking" in violation of 18 U.S.C. § 2119, using a firearm during and in relation to the carjacking offense, in violation of 18 U.S.C. § 924(c), and being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). These charges stem from allegations that on the night of October 3, 2010, Yancy (along with another man named Orlando Potts) forcibly took a 1995 Nissan Pathfinder from Rodney Webster, by threatening Webster with a shotgun. Yancy allegedly used a blue shirt to cover his face and had a white sock over his hand as he handled the shotgun. Officers with the Memphis Police Department ("MPD") immediately canvassed the area and detained Yancy, Potts, and another man who was with Yancy and Potts. The officers presented the men one at a time to Webster for a "show-up" identification, and Webster identified

Yancy and Potts as the carjackers.  The officers seized evidence from the scene of the arrest, including a shotgun, a blue shirt, and a white sock.  The officers also found in Yancy's pants pocket a set of keys which belonged to the stolen Pathfinder.  A few hours later, Webster looked over photo spread line-ups and identified Yancy's photograph as depicting one of the perpetrators.

Presently before the court by order of reference is Yancy's Motion to Suppress Evidence, filed on October 6, 2011.  (ECF No. 23.)  Yancy seeks to suppress the show-up identification as well as the photo spread identification made by Webster.  Yancy also moves to suppress the car keys seized by the officers.  The United States ("government") filed a response in opposition to the motion on November 1, 2011.  Yancy filed a Supplemental Motion to Suppress Evidence on November 7, 2011 (ECF No. 31), and the government filed a supplemental response on November 28, 2011.  On November 29, 2011, the court held a suppression hearing.  At the hearing, the government offered testimony from Officer Lee Potts, Officer Pierce Hayden, and Sergeant Marcus Frierson of the MPD; Officer Forrest Bartlett of the Shelby County Sheriff's Office; and Rodney Webster, the victim of the carjacking.

With leave of court, Yancy was permitted to file another supplemental brief on December 16, 2011, to address the issue of whether the court may consider independent, corroborative evidence of guilt in assessing the reliability of witness identifications.

(ECF No. 41.) The government filed a supplemental reply brief on
this limited issue on December 30, 2011. Also on December 16,
Yancy filed an unopposed Motion to Schedule Supplemental Hearing on
Defendant's Motion to Suppress Evidence, in which he requested that
the court schedule a second suppression hearing for the third week
of January 2012. Yancy stated that his counsel had reviewed
additional discovery materials provided by the government during
the suppression hearing and listened to recordings of the 911 call
and police radio communications relevant to this case. Yancy
stated that additional testimony would be necessary to clarify the
testimony provided by the officers at the November 29 hearing. The
court granted that motion, and on January 27, 2012, Officers Potts
and Bartlett were recalled as witnesses. The court received
additional evidence at the second hearing, including recordings of
the 911 call and police radio communications from the night of
Yancy's arrest.

Based on the briefs filed in support of and in opposition to
the motion, the evidence presented at the hearings, and the
applicable law, the court submits the following proposed findings
of fact and conclusions of law, and recommends that Yancy's motion
be denied.

## I. PROPOSED FINDINGS OF FACT

The court has carefully considered the testimony of all of the
witnesses, including their demeanor as they testified at the

hearings.  The court finds the officers and Webster to be credible.
Therefore, the court adopts their version of events as its proposed
findings of fact.

Approximately one week prior to October 3, 2010, Rodney
Webster was out walking his dog in the morning at the Red Oaks
apartment complex in Memphis, Tennessee.  Webster had been just
released from prison a couple of weeks earlier after having served
time for a felony.  He was staying with a friend, Marnisha Allen,
in her apartment, which was located in an apartment complex across
the street from the Red Oaks apartments.  Since being released from
prison, he had purposefully avoided having any contact with other
men because, according to Webster, he thought avoiding other men
would help him stay out of trouble.  As he was walking his dog,
another man - who Webster had never met before but later identified
as Christopher Yancy - asked Webster if he wanted to buy some
stereo equipment.  Webster told Yancy that he was not interested,
but agreed to accompany Yancy back to his apartment to look at the
equipment, in case he knew of someone who might be interested in a
stereo system.  Webster and Yancy spoke for approximately ten to
fifteen minutes.  As Webster was talking to Yancy, he noticed that
Yancy had a hump in his upper back.  Webster then left Yancy's
apartment.

On the night of October 3, 2010, MPD Officer Lee Potts was on
routine patrol in his police vehicle with a trainee, Officer Seth

-4-

Joneas.  At approximately 8:15 p.m., the MPD received a robbery complaint from an individual named Marilyn Johnson.  Johnson informed the officers who had responded to the call that she had been robbed outside the McKellar Woods apartment, located on Airways Boulevard in Memphis.[1]  She stated that as she exited her vehicle, she was held up by three black men in their early twenties with blue rags covering their faces and dark clothing.  One of the men was armed with a shotgun.  Johnson informed the officers that the men took her purse and backpack, and fled the scene on foot.  A broadcast went out over the police radio regarding the robbery and providing the description of the suspects given by Johnson.  Officer Potts heard the description, and he and Officer Joneas canvassed the surrounding area in search of the suspects.

While searching the area, Officer Potts drove past the Ayoka convenience store, located near the McKellar Woods apartments at the corner of Airways Boulevard and Wilson Road.  Officer Potts saw two young men standing outside the store.  At the time, Officer Potts had no reason to believe that these men were connected to the Johnson robbery.  As Officer Potts pulled up to the store, one of the men ran away through a wooded "cut" pathway that led to the nearby Red Oaks apartments.  Officer Potts spoke with the remaining man, Orlando Potts (no relation to Officer Potts), and told him

---

[1]The McKellar Woods apartment complex is also known as the Highland Meadows apartments.

that he could not loiter at the store. Orlando Potts left the store and walked through the cut toward the Red Oaks apartments.

At approximately 9:30 p.m. that night, Webster went the Ayoka convenience store to purchase tobacco products. Webster arrived at the store in a 1995 Nissan Pathfinder, which he had borrowed from Allen. As Webster exited the Pathfinder and walked toward the front entrance, he saw a young man standing outside the store wearing a blue hooded sweatshirt and blue jeans. The man gave Webster a "peace" hand gesture. After completing his purchase, Webster left the store and went back to his vehicle. As he approached his vehicle, Webster heard a voice from behind telling him to turn around and step away from the vehicle. The man had a black shotgun with a white sock covering his hand. The man also had a blue shirt wrapped around his head. Although Webster could only see the gunman's eyes, Webster recognized the man's voice as belonging to the man who had tried to sell him the stereo equipment a week earlier. The man told Webster to walk away from the vehicle toward the west side of the store. As Webster did so, the young man Webster had seen earlier standing outside the store stepped out of the bushes and joined the gunman. Webster was able to get a good look at the younger man because, at that point, the hood from his sweatshirt was down. The young man then pulled his sweatshirt up to cover his face. The gunman asked Webster whether he had any money. When Webster said no, he was told to take off his shoes and

-6-

strip down to his underwear, hand over his car keys, and go through the cut to the Red Oaks apartments. The gunman told Webster that he would be shot if he did not comply.

Webster took off his clothes and shoes, and ran to Allen's apartment. As he ran along Wilson Road, Webster saw the two carjackers drive past him in the Pathfinder. When he got to the apartment, he told Allen what had happened, at which time she called 911. Allen told the 911 operator that two black men had just stolen her gray Nissan Pathfinder from her friend, that one of the men had a shotgun, that both men had blue sweaters around their faces, and that the men were last seen heading westbound on Wilson Road toward Millbranch Road. The 911 operator broadcasted this information over the police radio.

Shortly after this broadcast, the operator made another broadcast based on a 911 call received from the owner of the Ayoka convenience store. The store owner reported that he had seen three black men outside of his store with light blue rags over their faces, one of whom was armed with a shotgun. The owner stated that he believed the men were going to rob his store. Several MPD officers, including Officer Potts, immediately responded to these broadcasts by canvassing the area. They also sought additional information from the operator about the direction that the

carjackers were headed and the Pathfinder's license plate number.[2]
Officer Pierce Hayden along with other MPD officers went to Allen's
apartment to interview Webster.

As Officers Potts and Joneas were driving through the Red Oaks
apartments looking for the suspects, they saw three black men,
later identified as Yancy, Orlando Potts, and Dewayne Johnson,
walking northbound.  Although it was dark outside, the area was
well lit, which enabled the officers to clearly see the three men.
As their police vehicle approached the three men from behind,
Officer Potts saw Orlando Potts holding a shotgun, which he then
tossed into some nearby bushes.  Officer Potts witnessed Yancy
throw a blue shirt and Johnson throw another object, which was
later discovered to be a white sock.  Officer Potts radioed to the
dispatcher that he spotted the three suspects and "we got the
shotgun."  Officers Potts and Joneas exited their vehicle with
their weapons drawn, ordered the three men to the ground, and
placed them in handcuffs.  The three men were detained and
searched.  During the search, one of the officers removed a set of
car keys from Yancy's pants pocket, which was taken and placed on
the back of Officer Potts's police car.

Meanwhile, Officer Hayden interviewed Webster at Allen's

---

[2]Although it appears that the Ayoka store attempted robbery
occurred sometime prior to the Webster carjacking, the recordings
of the police radio communications indicate that the 911 broadcast
on the Webster carjacking went out before the broadcast of the
attempted robbery.

apartment and obtained a more detailed description of the carjackers. Webster stated that the younger man was in his twenties with a dark complexion, stood about 5'5" tall, weighed about 140 pounds, and had on a blue "hoodie" and blue jeans. Webster said the gunman was approximately 6'0" tall, weighed about 170 pounds, had a blue shirt over his face, and was armed with a shotgun. Webster stated that the gunman was the same man who had approached him a week earlier, because he recognized his voice and the hump in his back.[3] Officer Hayden broadcasted these descriptions of the carjackers over the police radio.[4] Officer Potts responded to the broadcast and informed Officer Hayden that he had individuals matching the descriptions in custody.

Officer Hayden then brought Webster to Officer Potts's location to conduct a show-up identification. The show-up identification occurred approximately one hour after the

---

[3] Webster testified that Yancy was the only male he had any conversations with between the time he (Webster) was released from prison to the time he was carjacked.

[4] Officer Potts provided conflicting testimony at the November 29 and January 27 suppression hearings regarding the timing of when he heard the description of the carjackers and when he detained the three suspects. The conflicting testimony can be explained by the confusion resulting from the multiple 911 calls broadcasted that evening during a very short period of time. The recordings admitted into evidence at the hearing demonstrate that Officer Potts received and responded to the 911 operator's initial broadcast of the Webster carjacking before he saw the three suspects in the Red Oaks apartments. After the suspects were detained, Officer Potts received Officer Hayden's broadcast of the carjackers' physical descriptions.

carjacking.  Webster was shown the shotgun, blue shirt, and white sock on the ground, which he identified as the same items used in the carjacking.  Webster was then placed in the backseat of Officer Hayden's car as Yancy, Potts, and Johnson were each escorted, one at a time, toward Officer Hayden's rear window.  Webster did not recognize Johnson, who was the first suspect shown to him.  Webster identified Potts and Yancy, the second and third suspects shown to him, respectively, as the two men who had carjacked him.  After the show-up, Webster described the keys that had been taken from him during the carjacking.  One of the officers took the set of keys that had been recovered from Yancy's pants pocket and showed them to Webster.  He confirmed that the keys belonged to the stolen Pathfinder.  Officers later found the Pathfinder parked on a nearby street.

After completing the show-up identification, Webster was taken to the police station to provide a statement.  While at the station, at approximately 2:00 a.m., Sergeant Marcus Frierson showed Webster a photo spread lineup comprised of six photographs, one of which was Yancy's.  The other photographs were gathered by Sergeant Frierson from a computer database and depicted individuals of similar skin color and age, and who also wore red shirts like the one Yancy was wearing when he was arrested and photographed. Due to an oversight, two of the photographs were of the same individual (not Yancy), although one photograph was noticeably

darker than the other.  Prior to showing Webster the photo spread, Sergeant Frierson provided him with a document titled Advice to Witness Viewing Photographic Display, which described the photo spread identification process and which Webster signed and dated.[5] Webster circled the photograph of Yancy without hesitation and wrote at the bottom of the photo spread, "This is the guy that robbed me.  I meant [sic] him about a week ago.  I reconized [sic] his voice."  Subsequently, Webster was presented with a second photo spread with six photographs, one of which was of Johnson. Webster did not identify any of the photographs in the second photo spread.  At the police station, Yancy, Orlando Potts, and Johnson were advised of their <u>Miranda</u> rights.  Yancy refused to give a statement.  Potts and Johnson waived their <u>Miranda</u> rights and gave

---

[5]The form provided in part as follows:

> 1.  The photographic display will contain pictures of persons of similar descriptions in similar poses.
>
> 2.  There is no significance to the order in which the photos appear.
>
> 3.  The person pictured may or may not have anything to do with the suspect offense and I am not to assume that the guilty party must be one of the persons represented.
>
> 4.  During the interviewed [sic] process, no one is to give me any hints or suggestions or attempt to influence my identification in any way.
>
> 5.  If I make an identification, it will be done in writing.
>
> 6.  I am to make no identification unless I am positive of such identification.

signed confessions in which they identified Yancy as the gunman and Potts as his accomplice in the Webster carjacking.

In his motion to suppress, Yancy claims that the car keys seized from his pants pocket should be suppressed, because the officers did not have probable cause to arrest him and therefore were not authorized to search him incident to arrest.[6]  He also contends that, even if the officers possessed reasonable suspicion that he had committed a crime and was armed and dangerous, the officers were not authorized to seize the keys because the keys did not resemble a weapon which might be used to assault the officers. Yancy further argues that the show-up identification conducted by the officers at the scene of the arrest was unduly suggestive and that Webster's identification was unreliable.  Similarly, Yancy argues that the photo spread lineup and identification were unduly

_____

[6]Yancy does not (and cannot) seek suppression of the shotgun that was tossed by Orlando Potts or the white sock tossed by Johnson. See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); see also United States v. Sherrills, 432 F. App'x 476, 482-83 (6th Cir. 2011) (holding that defendant had no privacy interest in items possessed by passengers riding in the vehicle she was driving). Nor does Yancy seek to suppress the blue shirt that he tossed when he saw the officers approaching.  See United States v. Martin, 399 F.3d 750, 752 (6th Cir. 2005) (stating that "because a seizure does not occur when a mere show of authority occurs, but only when one yields to a show of authority, the Fourth Amendment does not apply to anything one may abandon while fleeing the police in an attempt to avoid a seizure").

suggestive and unreliable.[7]

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Seizure of the Keys

The court finds that the officers' pat-down of Yancy's person and seizure of the car keys from his pants pocket did not violate the Fourth Amendment.  The officers' actions were justified because (1) even though Yancy was not under arrest at the time, the officers could seize the keys for officer safety, or in the alternative, the keys would have been inevitably discovered; and (2) assuming, *arguendo*, that Yancy was under arrest at the time the keys were found, the officers had probable cause to arrest him and conduct a search incident to the arrest.

First, the officers had "reasonable and articulable suspicion" that Yancy committed a crime and therefore were authorized to detain him pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  <u>See</u> <u>United States v. Urrieta</u>, 520 F.3d 569, 573 (6th Cir. 2008); <u>United States v. Lopez-Arias</u>, 344 F.3d 623, 627 (6th Cir. 2003).  The officers were aware of three separate 911 calls, all of which occurred within a short period of time and involved crimes which occurred in the same vicinity.  The officers received information that Marilyn Johnson had been robbed at an apartment complex on

---

[7]Yancy further argues that any post-arrest statements made by him should be suppressed, because such statements were obtained in violation of his Fifth Amendment rights.  The government stated at the November 29 hearing that Yancy did not make any post-arrest statements.

Airways Boulevard by three black men in their early twenties, that the men had blue rags covering their faces and dark clothing, and that one of the men was armed with a shotgun. Shortly thereafter, the officers received information about two black men involved in a carjacking at the Ayoka store on Airways Boulevard, that both men had blue sweaters around their faces, and that one of them had a shotgun. The officers were then made aware that the owner of the Ayoka store reported seeing three black men outside of his store with light blue rags over their faces, that one of them was armed with a shotgun, and that it looked like they were going to rob the store. As Officer Potts was canvassing the Red Oaks apartments (located near the Ayoka store), he saw three black men and witnessed one of them toss a shotgun and another toss a blue shirt – items used in all three reported crimes. Based on the prior information and Officer Potts's observations, the officers had reasonable suspicion to detain Yancy and the two other men.

The fact that the officers drew their weapons, ordered the three men to the ground, and placed them in handcuffs did not transform the <u>Terry</u> detention into an arrest. An investigative <u>Terry</u> stop may transform into an arrest due to various factors, such as the passage of time, the use of force, transportation of the suspects to a different location, the issuance of <u>Miranda</u> warnings, and the interrogation of the suspects. <u>See</u> <u>United States v. Williams</u>, 170 F. App'x 399, 402-03 (6th Cir. 2006); <u>Lopez-Arias</u>,

-14-

344 F.3d at 627; <u>Houston v. Clark Cnty. Sheriff Deputy Sheriff John</u>
<u>Does 1-5</u>, 174 F.3d 809, 814 (6th Cir. 1999). However, "there is no
bright line rule that distinguishes an investigative stop from a *de*
*facto* arrest." <u>Houston</u>, 174 F.3d at 814; <u>see also</u> <u>Lopez-Arias</u>, 344
F.3d at 628 ("there is no bright line that distinguishes an
investigative detention from an arrest"). Instead, "the analysis
is a fact-sensitive inquiry, depending on the totality of the
circumstances." <u>Williams</u>, 170 F. App'x at 402-03 (citing <u>Lopez-</u>
<u>Arias</u>, 344 F.3d at 627-28).

In <u>Houston</u>, a § 1983 action, the civil defendants were police
officers who had responded to a theft call at a local bar. During
their investigation of the incident, they heard gun fire in the
parking lot, saw a victim on the ground who they believed had been
shot, and pursued multiple suspects who fled the scene in a car.
When the officers caught up to the suspected vehicle (which turned
out to be the wrong vehicle), they drew their weapons, ordered the
passengers out of the car, handcuffed them on the ground, placed
them in police cruisers, and detained them for approximately thirty
minutes to one hour. The Sixth Circuit held that this
investigative stop did not ripen into an arrest and that the
officers' actions did not fun afoul of the Fourth Amendment. The
court stated:

> when police officers reasonably fear that suspects are
> armed and dangerous, they may order the suspects out of
> a car and may draw their weapons when those steps are
> "reasonably necessary to the protection of the officers."

> Further, detention in a police cruiser does not automatically transform a <u>Terry</u> stop into an arrest. Nor does the use of handcuffs exceed the bounds of a <u>Terry</u> stop, so long as the circumstances warrant that precaution.

<u>Id.</u> at 814-15 (internal citations omitted); <u>see also</u> <u>United States v. Jacob</u>, 377 F.3d 573, 579-80 (6th Cir. 2004); <u>United States v. Avery</u>, No. 07-20040, 2010 WL 419946, at *3-4 (W.D. Tenn. Jan. 28, 2010).

In the present case, the court finds that Officer Potts's actions were justified and reasonable under the circumstances, and those actions did not transform the <u>Terry</u> stop into an arrest. Officer Potts was accompanied only by an officer-in-training, and he had to confront three suspects, in an apartment complex, at night. The men were suspected of committing armed robbery, armed carjacking, and attempted armed robbery of a business. Officer Potts saw Orlando Potts toss a shotgun, and while it turned out that the item Johnson tossed was a sock, Officer Potts did not know that at the time. It was certainly reasonable for Officer Potts to believe the three men could be armed and dangerous, and thus reasonable for him to draw his weapon, order them to the ground, and place them in handcuffs. Moreover, Yancy was detained only long enough for Webster to come to the scene and identify the carjackers, Yancy had not been transported to a different location, he had not been given his <u>Miranda</u> warnings, and he had not been interrogated by the police.

As part of the <u>Terry</u> stop and investigation, the officers were justified in conducting a weapons frisk of Yancy's person and to remove weapons or tools that could harm the arresting officer. <u>Webster v. United States</u>, No. 1:10-0002, 2010 WL 1427316, at *8 (M.D. Tenn. Apr. 8, 2010). It is well known that keys can be used as a weapon.[8] <u>See</u> <u>Saillant v. City of Greenwood</u>, No. IP01-1760 C-T/K, 2003 WL 24032987, at *6 (S.D. Ind. Apr. 17, 2003) ("No constitutional violation is committed by an officer who seizes a key in the reasonable belief that it could be employed as a weapon."); <u>see also</u> Adam Wik, <u>Keys as a Weapon</u>, Sept. 30, 2009, EXAMINER.COM, www.examiner.com/martial-arts-in-cincinnati/keys-as-a-weapon; Lori Hoeck, <u>The Key to Using Keys in Self Defense</u>, June 10, 2009, THINK LIKE A BLACK BELT, thinklikeablackbelt.com/blog/the-key-to-using-keys-in-self-defense; Joseph Lewis, <u>Traffic Warden Attacked with Car Key in Hove</u>, Feb. 22, 2011, NEWS FROM BRIGHTON, newsfrombrighton.co.uk/brighton-and-hove-news/hove/traffic-warden-attacked-with-car-key-in-hove.

Alternatively, because the discovery of the keys was inevitable, suppression of that evidence is not warranted. <u>United States v. Lazar</u>, 604 F.3d 230, 239 (6th Cir. 2010). The doctrine

---

[8]Officer Potts testified that the keys were removed from Yancy's pants pocket for officer safety and that keys can be used as a weapon.

of inevitable discovery applies if "'the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered.'" <u>United States v. Keszthelyi</u>, 308 F.3d 557, 574 (6th Cir. 2002) (quoting <u>United States v. Kennedy</u>, 61 F.3d 494, 499 (6th Cir. 1995)). In other words, evidence seized during an illegal search is admissible if the evidence would have inevitably been discovered during a subsequent lawful search. <u>Id.</u> at 573. Here, even without the discovery of the keys, the officers had compelling evidence of Yancy's involvement in the crimes, including Webster's positive identification of Yancy at the scene. Thus, at the end of the day, Yancy would have still been arrested and he would have been searched incident to the arrest – at which time the keys would have been discovered. <u>United States v. Hunter</u>, 333 F. App'x 920, 926 (6th Cir. 2009) (citing <u>Arizona v. Gant</u>, 129 S. Ct. 1710, 1717-18 (2009)); <u>United States v. Montgomery</u>, 377 F.3d 582, 586 (6th Cir. 2004). Moreover, Yancy would have undoubtedly been searched again when he arrived at the police station, where his personal possessions would have been inventoried. <u>See</u> <u>United States v. Thomas</u>, 11 F.3d 620, 628-29 (6th Cir. 1993) (citing <u>Colorado v. Bertine</u>, 479 U.S. 367, 370 (1987)).

Second, even assuming, *arguendo*, that Yancy was under arrest prior to the time that the officers found the keys, the court

nevertheless concludes that the officers had probable cause to arrest Yancy prior to seizing the car keys. Whether probable cause exists turns on whether the "'facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent' person to conclude that an individual either had committed or was committed an offense." <u>United States v. Torres-Ramos</u>, 536 F.3d 542, 555 (6th Cir. 2008) (quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)). In order to determine whether probable cause existed at the time of the arrest, the court looks to the totality of the circumstances. <u>United States v. Romero</u>, 452 F.3d 610, 616 (6th Cir. 2006) (citations omitted). As discussed at length above, the officers were aware that three black men had committed an armed robbery and an attempted armed robbery of a business and that two black men had committed armed carjacking, that the men had blue rags or sweaters covering their faces, that one of the men had a shotgun, and that the crimes occurred in close proximity to the Red Oaks apartments. When Officer Potts saw three black men walking in the Red Oaks apartments and saw one man toss a shotgun and another man toss a blue shirt, Officer Potts had probable cause to believe that the men were involved in the crimes. Based on this information and Officer Potts's observations, the officers had probable cause to arrest Yancy immediately. Once Yancy was under arrest, the officers could search his person and seize the car keys

as a search incident to an arrest.  <u>Hunter</u>, 333 F. App'x at 926;

<u>Montgomery</u>, 377 F.3d at 586.

## B.  Identifications

When determining the admissibility of a pretrial

identification, the court must "determine[] whether the

identification procedure is 'unnecessarily suggestive and conducive

to irreparable mistake in identification.'"  <u>United States v.</u>

<u>Craig</u>, 198 F. App'x 459, 466 (6th Cir. 2006) (quoting <u>Stovall v.</u>

<u>Denno</u>, 388 U.S. 293, 302 (1967)).  To assess the validity of a

pretrial identification, the court conducts a two-step analysis:

> The court first considers whether the procedure was
> unduly suggestive.  The defendant bears the burden of
> proving this element.  If the court does find that the
> procedure was unduly suggestive, it next evaluates the
> totality of the circumstances to determine whether the
> identification was nevertheless reliable.  Five factors
> that are considered in assessing the reliability of the
> identification include: (1) the opportunity of the
> witness to view the criminal at the time of the crime;
> (2) the witness's degree of attention at the time of
> observation; (3) the accuracy of the witness's prior
> description of the criminal; (4) the level of certainty
> demonstrated by the witness when confronting the
> defendant; and (5) the length of time between the crime
> and the confrontation.

<u>Ledbetter v. Edwards</u>, 35 F.3d 1062, 1070-71 (6th Cir. 1994); <u>see</u>

<u>also</u> <u>Gross v. Warden, Lebanon Corr. Inst.</u>, 426 F. App'x 349, 361-62

(6th Cir. 2011) (citing <u>Ledbetter</u> and discussing two-step

analysis).  These five reliability factors were established by the

Supreme Court in <u>Neil v. Biggers</u>, 409 U.S. 188 (1972), and are

often referred to as the <u>Biggers</u> factors.

The Sixth Circuit has suggested that show-up identifications are "inherently suggestive," but that "in some cases, a showup becomes a necessary identification procedure." Summit v. Bordenkircher, 608 F.2d 247, 252 (6th Cir. 1979). In fact, in Summit, the Sixth Circuit held that despite the suggestiveness of the identification process, "[b]ased on the totality of the circumstances, we cannot conclude that the identification at the showup was so unreliable as to create a substantial likelihood of misidentification." Id. Courts have found pretrial show-up identifications to be reliable, despite their inherently suggestive nature. See, e.g., Jennings v. Beightler, No. 4:10-CV-2371, 2011 WL 6960993, at *9-10 (N.D. Ohio 2011); McKinney v. Warden, Warren Corr. Inst., No. 2:09-CV-00498, 2011 WL 901029, *14-15 (S.D. Ohio 2011); United States v. Potter, 2010 WL 2776342, at *5-8 (E.D. Tenn. 2010). The Sixth Circuit has also noted that "[p]rompt on-the-scene confrontation is actually consistent with good police work" and that "handcuffs and police custody are necessary incidents of an on-the-scene identification that do not render the pre-trial identification procedure unnecessarily suggestive." Craig, 198 F. App'x at 466 n.1.

The court finds that, even though Webster's show-up identification may have been suggestive in nature, it was nonetheless reliable based on an examination of the Biggers factors. First, Webster had a significant amount of time during

-21-

the carjacking to observe Yancy and Orlando Potts. Yancy did not merely hold up Webster and then jump into his vehicle. Instead, he spoke to Webster, told him to step away from his vehicle, told him to turn over his keys, and had him remove his clothes. This provided Webster with additional time to hear Yancy's voice and observe his clothing and physical characteristics. Webster testified that he recognized the gunman as being the man he met a week earlier, based on his voice and the hump in his back. Second, Webster was focused on Yancy throughout the encounter, due to the fact that Yancy was asking him questions and telling him what to do. In addition, Webster testified that no other cars were parked outside the store, and nobody other than Webster, Yancy, and Potts was present during the robbery. Third, Webster's description of the suspects to police officers prior to the show-up identification was very accurate and entirely consistent with what he told Allen when he returned to her apartment. He described the color and type of gun used, the blue shirt used by Yancy to cover his face, the sock on Yancy's hand, and the height and build of each suspect.[9] Each of the details regarding Yancy turned out to be accurate, as was Webster's description of Potts. Fourth, Webster did not express any uncertainty when making his identification. In fact, before Webster identified Yancy and Potts, he told the officers

_____

[9]Officer Hayden testified that Webster identified the shotgun as being black in color and Webster testified that he told the officers the gunman had a sock on his hand.

that the first suspect they showed him, Johnson, was not involved in the robbery. This demonstrates that Webster was not merely making his identifications based on the fact that the police had them in custody. Finally, the length of time between the crime and identification was approximately only one hour.[10] For these reasons, the court finds that Webster's identification of Yancy at the scene of the arrest was reliable.

The next identification that Yancy seeks to suppress is the photo spread lineup conducted by Sergeant Frierson after Webster was taken to the police station. The court finds that Yancy has not met his burden of showing that this identification was unduly suggestive. The photo spread lineup administered to Webster included photographs of four other individuals, all with similar skin color, of approximately the same age, and wearing red shirts, so as not to draw attention to any individual. Webster was provided with a form that outlined the identification procedure, including the possibility that his assailant would not be pictured at all, and there is no evidence that Sergeant Frierson influenced Webster in any way during the identification process. In addition, the court finds that the presence of two duplicate photographs of

---

[10]Officer Potts testified at the November 29 hearing that MPD guidelines call for show-up identifications to be conducted within one hour of the crime. To the extent the show-up identification in this case may have taken place a few minutes past the one hour mark, the court finds that this potential violation of MPD policy does not render the identification unreliable.

another individual did not render the identification unduly suggestive. This duplication was not obvious at first glance due to the darker nature of one of the photographs. The court also finds that the identification was not unduly suggestive merely because it occurred after an earlier show-up identification. See United States v. Drake, 543 F.3d 1080, 1088-89 (9th Cir. 2008) (finding permissible a photo spread lineup conducted four days after a show-up had already occurred).[11]

## III. CONCLUSION

For the reasons above, the court recommends that Yancy's motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

March 5, 2012
Date

---

[11]Because the court finds that neither the show-up identification nor the photo spread identification was so suggestive or unreliable as to render them inadmissible, the court need not reach the issue of whether it is appropriate to look at other factors, such as evidence of general guilt, when assessing the reliability of an identification. Compare Keene v. Mitchell, 525 F.3d 461, 466 (6th Cir. 2008); United States v. Wilkerson, 84 F.3d 692, 695 (4th Cir. 1996); United States v. Lau, 828 F.2d, 875 (1st Cir. 1987); United States ex re. Kosik v. Napoli, 814 F.2d 1151, 1156-57 (7th Cir. 1987); Graham v. Solem, 728 F.2d 1533, 1546 (8th Cir. 1984), with Raheem v. Kelly, 257 F.3d 122, 141 (2d Cir. 2001); United States v. Rogers, 126 F.3d 655, 659 (5th Cir. 1997); United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995).

## NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.